IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ASHLEY PAUOLE,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>LELAND DUDEK, Acting Commissioner of Social Security,<br><br>　　　　　　　Defendant. | CIV. NO. 24-00470 JMS-RT<br><br>ORDER REVERSING THE ALJ'S DECISION AND REMANDING FOR FURTHER PROCEEDINGS |

**ORDER REVERSING THE ALJ'S DECISION AND REMANDING FOR FURTHER PROCEEDINGS**

**I. INTRODUCTION**

Ashley Pauole ("Pauole") seeks judicial review under 42 U.S.C. § 405(g) of a final decision of the Acting Commissioner of Social Security, Leland Dudek ("Commissioner").[1]  ECF No. 1.  The Commissioner adopted Administrative Law Judge Ruxana Meyer's ("ALJ") January 24, 2024 decision finding Pauole not disabled under § 216(i) and § 223(d) of the Social Security Act ("ALJ's Decision").  Pauole argues the ALJ committed legal error by (1) failing to provide clear and convincing evidence for discrediting her symptom

---

[1] Leland Dudek is Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* § 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (providing that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

testimony for post-traumatic stress disorder ("PTSD"), major depressive disorder ("MDD"), generalized anxiety disorder ("GAD"), and obsessive-compulsive disorder ("OCD"); and (2) failing to properly evaluate the medical opinion of her mental health provider, Lisa Nguyen, M.D.  *See* ECF No. 12 at PageID.1209.

The court finds that the ALJ erred in failing to account for the fact that Pauole's mental impairments wax and wane when assessing her residual functional capacity ("RFC"), which was, thus, not based on substantial evidence. Accordingly, the court REVERSES the Commissioner's final decision and REMANDS for further proceedings.

## II.  BACKGROUND

**A.  The Social Security Disability Determination Framework and the ALJ's Findings and Decision**

On September 14, 2021, then-34-year-old Pauole applied for Social Security Disability Insurance benefits, alleging January 1, 2017, as the disability onset date.  Administrative Record ("AR")[2] 186, 221.  Her claim for Title II Social Security Disability Benefits was denied on January 21, 2022, and on reconsideration on April 28, 2022.  AR 99–103, 110–114.  At the December 13, 2023 administrative hearing, Pauole amended her alleged disability onset date to

---

[2] The AR is numbered sequentially from pages 1 to 1176 and is available at ECF Nos. 10 through 10-8.

January 1, 2020.[3]  AR 42.  Thus, the relevant period for purposes of this appeal is January 1, 2020, to December 31, 2020, the date last insured.  *See* AR 17–18.

The Social Security Administration has established a five-step sequential analysis to assess disability,[4] which asks:

> (1)    Has claimant been engaged in substantial gainful activity?  If so, she is not disabled.  If not, proceed to step two.
>
> (2)    Has claimant's alleged impairment been sufficiently severe to limit her ability to work?  If not, she is not disabled.  If so, proceed to step three.
>
> (3)    Does claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, she is disabled.  If not, proceed to step four.
>
> (4)    Does claimant possess the RFC[5] to perform her past relevant work?  If so, she is not disabled.  If not, proceed to step five.

---

[3]  Pauole's counsel explained at the administrative hearing that the amended alleged onset date corresponded with a "worsening" of Pauole's depressive disorder and a January 23, 2020 emergency room visit for suicidal ideation.  AR 42.

[4]  A claimant is "disabled" for purposes of the Social Security Act if (a) she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and (b) the impairment renders her incapable of performing the work that she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(1)(A) and (d)(2)(A); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[5]  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citing 20 C.F.R. § 416.920(e)).  A claimant's RFC is "the most you can still do despite your limitations."  20 C.F.R. § 416.945(a)(1).

> (5)   Does claimant's RFC, when considered with her age, education, and work experience, allow her to adjust to other work that exists in significant numbers in the national economy? If so, she is not disabled. If not, she is disabled.

*See, e.g.*, *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006) (citing 20 C.F.R. § 404.1520 (explaining the five-step sequential evaluation process used to decide whether a claimant is disabled)); *see also Woods v. Kijakazi*, 32 F.4th 785, 787 n.1 (9th Cir. 2022) (stating that the 2017 revised Social Security regulations do not alter the familiar "five-step sequential evaluation process"). For steps 1 through 4, the burden of proof is on the claimant, and if the claimant reaches step 5, the burden shifts to the Commissioner. *Tackett*, 180 F.3d at 1098.

At step 1, the ALJ found that Pauole had not engaged in substantial gainful activity since January 1, 2020. AR 19 (citing 20 C.F.R. § 404.1571 et seq.).

At step 2, the ALJ found that Pauole had the following severe impairments: PTSD; MDD; GAD; and OCD. *Id.* (citing 20 C.F.R. § 404.1520(c)). She also found Pauole's impairments due to obesity, anemia, and gastroesophageal reflux disease were not severe. AR 20–21 (citing 20 C.F.R. § 404.1520(c)).

At step 3, the ALJ found that through December 31, 2020, Pauole did not have an impairment or combination of impairments that met or was medically equal to the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  AR 21 (citing 20 C.F.R §§ 404.1520(d), 404.1525, and 404.1526).  The ALJ evaluated listings in sections 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders) but found that Pauole did not have the criteria to meet any of the listings.  AR 21–23.

Between steps 3 and 4, the ALJ assessed Pauole's RFC.  The ALJ found that during the relevant period, Pauole had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: "[Pauole] was able to perform work that required no more than frequent interaction with coworkers and supervisors.  She was able to do work that did not involve contact with the general public as a job duty."  AR 23.

At step 4, the ALJ determined that through December 31, 2020, Pauole was unable to perform any past relevant work as a resident manager.  AR 30 (citing 20 C.F.R. § 404.1565).

At step 5, the ALJ found that through December 31, 2020, there were jobs that existed in significant numbers in the national economy that Pauole could have performed (given her age, education, work experience, and RFC).  AR 31 (citing 20 C.F.R. §§ 404.1569, 404.1569a).  The vocational expert ("VE") testified that given Pauole's limitations, she would have been able to perform the requirements of occupations such as office helper, marker (semiconductor), or sealer (semiconductor).  AR 32.  Based on the VE's testimony, the ALJ found Pauole not disabled.  *Id.*

**B.     Procedural Background**

On January 24, 2024, the ALJ issued her Decision finding Pauole not disabled from January 1, 2020, through December 31, 2020. AR 14–37. This denial became final when the Appeals Council denied Pauole's request for review on October 16, 2024. AR 1–6. Pauole brought this action for judicial review on November 6, 2024. ECF No. 1.

Pauole filed her Opening Brief on March 6, 2025. ECF No. 12. The Commissioner filed an Answering Brief on April 7, 2025. ECF No. 14. Pauole filed her Reply Brief on April 22, 2025. ECF No. 15. The court held a hearing on May 23, 2025.

### III.  STANDARDS OF REVIEW

**A.     General Standard**

Congress has provided a limited scope for judicial review of the Commissioner's decision to deny benefits under the Social Security Act. *See* 42 U.S.C. § 405(g); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) ("For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency.") (internal quotation and citation omitted).

Guided by this principle, courts employ "three important rules" when assessing an ALJ's decision. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). First, courts "leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id*. (quoting *Treichler*, 775 F.3d at 1098). Second, courts will "disturb the Commissioner's decision to deny benefits 'only if it is not supported by substantial evidence or is based on legal error.'" *Id*. (quoting *Treichler*, 775 F.3d at 1098). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522 (9th Cir. 2014) (internal quotation and citation omitted).

To determine whether there is substantial evidence, courts "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citations and quotation marks omitted). If the record, considered as a whole, can reasonably support either affirming or reversing the ALJ's decision, the decision must be affirmed. *Id*. at 1010 (citations omitted). "Nevertheless, a decision supported by substantial evidence will still be set aside if the ALJ did not apply proper legal standards." *Gutierrez*, 740 F.3d at 523.

And third, even where the ALJ commits legal error, courts uphold the ALJ's decision if that error is harmless. *Brown-Hunter*, 806 F.3d at 492. An error is harmless if it is "inconsequential to the ultimate nondisability determination" or if "despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'" *Id*. (quoting *Treichler*, 775 F.3d at 1099).

B.   **Standard for Symptom Testimony**

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Smith v. Kijakazi*, 14 F.4th 1108, 1111 (9th Cir. 2021). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison*, 759 F.3d at 1014 (internal quotation marks omitted)). "At this step, the medical evidence need not corroborate the severity of the alleged symptoms; the medical evidence need only establish that the impairment could reasonably be expected to cause some degree of the alleged symptoms." *Id.* (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). "When objective medical evidence is inconsistent with a claimant's subjective testimony, an ALJ can 'reject the claimant's testimony about the severity of her symptoms only by offering specific, clear, and convincing reasons for doing so.'" *Smartt v. Kijakazi*, 53 F.4th 489, 494 (9th Cir. 2022) (quoting

8

*Garrison*, 759 F.3d at 1014–15); *see also Lingenfelter*, 504 F.3d at 1035–38 (noting that to satisfy the substantial evidence standard, the ALJ must provide specific, clear, and convincing reasons which explain why the medical evidence is inconsistent with the claimant's subjective symptom testimony).

"[A]n ALJ may not 'reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain.'" *Smartt*, 53 F.4th at 494–95 (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). The heightened standard does not apply when there is affirmative evidence of malingering. *Id.* at 497. In other words, absent affirmative evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting a claimant's subjective complaints.[6] *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008) (noting the clear-and-convincing-reasons standard does not apply upon affirmative evidence that the claimant is malingering).

"General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citation and internal quotation marks omitted)); *see also*

---

[6] The Commissioner relies upon an outdated standard—"sufficiently specific" findings, rather than clear and convincing reasons. *See* Answering Brief, ECF No. 14 at PageID.1232 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)).

*Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony.") (citation omitted); *cf. Johns v. Berryhill,* 2019 WL 1453482, at *1 (D. Haw. Apr. 2, 2019) (reversing and remanding Commissioner's decision because ALJ failed to properly "specifically identify" and discuss plaintiff's pain and symptom testimony in rejecting her testimony and finding her not disabled); *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (noting that to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "specific, cogent reasons for the disbelief.") (citation and internal quotation marks omitted).

> And specifically as to mental health issues,
>
> it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and treat them as a basis for concluding a claimant is capable of working.

*Garrison*, 759 F.3d at 1017.

### C.  Standard for Daily Activities

The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude

10

work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Id.* at 1016. Furthermore, recognizing that "'disability claimants should not be penalized for attempting to lead' their 'lives in the face of their limitations,'" the Ninth Circuit has "provided guidelines for using evidence of a claimant's activities of daily living to assess a claimant's symptom testimony." *Auapaau v. O'Malley*, 2024 WL 4301378, at *3 (D. Haw. Sept. 26, 2024) (quoting *Reddick*, 157 F.3d at 722). Accordingly, "daily activities may be found to bear on the credibility of a claimant's testimony only if (1) the activities actually contradict the claimant's symptom testimony, or (2) they show that the claimant spends a substantial part of their day engaged in pursuits that are transferable to a work setting." *Id*. (citing *Orn*, 495 F.3d at 639).

## IV.  DISCUSSION

Pauole asserts that the ALJ failed to sufficiently consider her symptom testimony of PTSD, GAD, and OCD in assessing the RFC. Specifically, Pauole argues that the ALJ (1) failed to acknowledge that mental illness symptoms wax and wane over time, and (2) selectively cited the record and mischaracterized her daily activities, resulting in an RFC not based on substantial evidence. *See generally* ECF No. 12. Because it is dispositive as the basis for remand, the court addresses the ALJ's adverse credibility finding as to the intensity, persistence, and limiting effects of Pauole's PTSD, GAD, and OCD.

## A.    The ALJ Improperly Failed to Credit Pauole's Symptom Testimony

At step one of the two-step *Smith* credibility framework the ALJ found that Pauole's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 26. At step two, however, she rejected Pauole's testimony regarding the intensity, persistence, and limiting effects of PTSD, GAD, and OCD as "not entirely consistent with the medical evidence and other evidence in the record," *id.*, resulting in assessing an RFC to perform work that did not require contact with the general public but that required "no more than frequent interaction with coworkers and supervisors." AR 23. This RFC purportedly accounted for Pauole's "agoraphobic tendencies and worries by limiting interpersonal demands." AR 28. It was also based on evidence that supported "grossly normal mental status examination findings and largely independent activities of daily living." *Id*.

### 1.    *Pauole's Testimony*

At the administrative hearing, Pauole testified to seeing Dr. Nguyen, her mental health care provider, at least once a month for five years. AR 57, 58. Pauole's depression intensified due to the COVID-19 pandemic, which is why she amended her alleged disability onset date. *See* AR 42, 58. Pauole testified that she could not get out of bed, would feel useless, and would be unable to shower more

than twice a month.  AR 59.  She testified to "balance and counting" from the

OCD:[7]

> I have to count in order to make sure that my whole
> house is safe—that my kids are safe—because I have to
> let them out, into the world.  And I can't protect them
> because I have to legally let them out, into the world.
> And because things happened to me [in my youth], I'm
> dirty.  And they're innocent and they're clean.  So, that's
> unbalanced.  I have to over—I don't even know what the
> word is.  I don't even know how to explain it.

AR 60.  The OCD also caused Pauole to pick at her skin.  AR 370, 372.

      As for GAD,[8] Pauole would have almost daily panic attacks that last

for 10–15 minutes, sometimes more than once a day.  AR 62.  She testified to

never having worked at a place she did not know.  AR 64.  She has a driver's

license and can drive to places she knows, such as to doctor's appointments.

AR 46, 47.  However, she has anxiety when driving and gets confused.  AR 47.

---

      [7] OCD "is a disorder marked by uncontrollable and recurring thoughts (obsessions), repetitive and excessive behaviors (compulsions), or both."  See National Institute of Mental Health ("NIH"), Obsessive-Compulsive Disorder, https://www.nimh.nih.gov/health/topics/obsessive-compulsive-disorder-ocd [https://perma.cc/B26M-59MJ].

      [8] GAD may involve "excessive anxiety and worry about a variety of events or activities . . . that occurs more days than not, for at least [six] months.  People with [GAD] find it difficult to control their worry, which may cause impairment in social, occupational, or other areas of functioning."  See NIH, Generalized Anxiety Disorder, https://www.nimh.nih.gov/health/statistics/generalized-anxiety-disorder [https://perma.cc/8QJQ-Y6J6].

Pauole's agoraphobic tendencies were based on a fear of contracting COVID-19 and transmitting it to her family, killing them.[9]  *See, e.g.*, AR 380.

The ALJ did not find or cite to any evidence of malingering; thus, she was required to provide clear and convincing reasons for rejecting Pauole's testimony.  *Carmickle*, 533 F.3d at 1160.  The ALJ failed to do so.

### 2. *Medical Evidence*

The ALJ and Commissioner selectively cite portions of the record that purportedly demonstrate Pauole's overall "improvement":

- On January 17, 2020, Pauole reported that the "[h]olidays were good," her depressive symptoms were well-controlled, and that her OCD symptoms improved with medication.  AR 24, 361; ECF No. 14 at PageID.1233.

- On January 23, 2020, Pauole reported to the emergency room with suicidal ideation, but she later reported that she no longer felt suicidal and inpatient admission was not required.  AR 25; ECF No. 14 at PageID.1233.

- On May 13, 2020, Pauole's "mood was still 'improved.'"  AR 368; ECF No. 14 at PageID.1233.

- On June 22, 2020, Pauole had a "flare of anxiety."  AR 370; ECF No. 14 at PageID.1233.

- On June 24, 2020, she was "much better."  AR 374; ECF No. 14 at PageID.1233.

---

[9] Agoraphobia is an anxiety disorder involving intense fear and anxiety of any place or situation where escape might be difficult.  It manifests in avoidance of situations such as being alone outside of the home; traveling in a car, bus, or airplane; or being in a crowded area.  *See* NIH, Agoraphobia, https://www.nimh.nih.gov/health/statistics/agoraphobia [https://perma.cc/T5VG-WDSC].

- On July 7, 2020, her mood was "OK."  AR 26, 380; ECF No. 14 at PageID.1233–1234.

- On August 19, 2020, Pauole was "[d]oing OK" with a normal mental status exam.  AR 26, 389; ECF No. 14 at PageID.1234.

- On September 16, 2020, her mood was "stable" with "no recent dips."  AR 958; ECF No. 14 at PageID.1234.

- On October 21, 2020, Pauole's mood was "stable."  AR 931; ECF No. 14 at PageID.1234.

- On December 16, 2020, she reported that she felt like she was "getting better."  AR 26, 935; ECF No. 14 at PageID.1234.

But the record also demonstrates that Pauole's symptoms waxed, as well as waned.  For instance:

- On March 9, 2020, although there was no suicidal ideation or self-harm, Pauole had increased difficulty with sleep[10] and depressive symptoms.  AR 364.

- On June 22, 2020, the same date the Commissioner noted a "flare of anxiety," Dr. Nguyen reported the need for a "crisis intervention" to assist with Pauole's difficulty getting out of bed, caring for herself and personal hygiene, increased OCD behaviors and agoraphobic tendencies, increased skin picking, and "scared" mood.  AR 370, 371.

- On June 23, 2020, Pauole's mood was "not good," she had difficulty getting out of bed, and she reported more OCD symptoms, which had been persistent for months but because she was "embarrassed," did not tell Dr. Nguyen; she continued skin picking.  AR 372, 373.

---

[10] Pauole testified why sleep was important:  "[W]hen you mess with sleep, that's when thinking about the—like death, you know—I just want peace."  AR 60.

- On June 24, 2020, the date when the Commissioner noted that Pauole was doing "[m]uch better," Pauole reported that she "was able to shower . . . after taking new medication" and had ongoing agoraphobic concerns due to COVID-19. AR 374.

- On July 6, 2020, Pauole had poor sleep and another "crisis intervention" was necessary because she was having suicidal ideation and engaging in self-harm by cutting and bashing her head against the wall. AR 378.

- On July 8, 2020, Pauole's agoraphobic concerns continued, she had difficulty with sleep and anhedonia, and noticed increased time invested on compulsions over the past few months. AR 382.

- On July 21, 2020, her depression made it difficult to get out of bed to eat regular meals. AR 447.

- From late July to late October 2020, Pauole experienced persistent OCD symptoms regarding COVID-19. AR 386, 929, 931.

- On November 18, 2020, she had poor sleep and ongoing anxiety regarding COVID-19, although she was able to go to Costco and the beach. AR 933.

It is improper to cherry-pick the record and rely on incidences of improvement while failing to recognize times of serious distress. *See Garrison*, 759 F.3d at 1017 & n.23 (noting that the ALJ is not permitted to "cherry-pick" from mixed evidence to support a denial of benefits and that it is error to reject a claimant's testimony regarding mental health merely because symptoms wax and wane) (quoting *Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011)); *see also Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) (explaining that an ALJ may

16

not simply cherry-pick evidence to discount opinions or make an adverse credibility determination) (citing *Scott*, 647 F.3d at 740); *see also Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1200–01 (9th Cir. 2008) (noting that references to plaintiff's anxiety and depression "improving" are insufficient to undermine repeated diagnosis of those conditions); *Holohan*, 246 F.3d at 1205 ("Dr. Oh's statements must be read in context of the overall diagnostic picture he draws.  That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").  Given this selective view of the evidence, the ALJ's findings were insufficiently general and lacked clear and convincing reasons to discredit Pauole's symptom testimony.  *See Brown-Hunter*, 806 F.3d at 493.[11]

Furthermore, Pauole explained that her "normal" mental-status examination findings were due to her ability to have telemedicine calls with Dr. Nguyen from the safety of her bed at home.[12]  AR 61.  In fact, Dr. Nguyen noted on June 22, 2020, and July 6, 2020, dates when "crisis interventions" were

---

[11] Likewise, the ALJ failed to address how Pauole's symptom fluctuations would enable her to have frequent interaction with coworkers and supervisors.

[12] Pauole explained: "[W]hen I first met Dr. Nguyen, I cried.  I didn't like the [medical office] garage, and my husband had to take me.  And when I met her in person, I cried.  I didn't want to be there.  But when I talked to her, after that—it's because I feel safe in my home.  She builds the environment." AR 61.

necessary, that Pauole exhibited linear thought, intact concentration, and within-normal-limits recent and remote memory—which are consistent with "normal" mental status examination findings. *See, e.g.*, AR 370–371, 378–379. Despite a normal mental status, these were not instances where Pauole could have a sustained performance in a work environment. "Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995), *superseded on other grounds by* 20 C.F.R. parts 404 & 416; *see also Reddick*, 157 F.3d at 724 (noting that Social Security regulations define RFC as the "maximum degree to which the individual retains the capacity for *sustained* performance of the physical-mental requirements of jobs.") (citing 20 C.F.R. § 404 Subpt. P, App. 2 § 200.00(c)).

       The ALJ does not mention Pauole's ability (or the lack thereof) to sustain employment, much less reconcile the findings that resulted in the assessed RFC.[13] For example, Pauole's work history reflects her capacity to work at places she knew very well; nonetheless, she could not sustain employment for very long due to her impairments. *See Bailey v. O'Malley*, 2024 WL 3914865, at *5, *5 n.3

---

[13] The ALJ posed a hypothetical to the vocational expert ("VE") that included, along with the RFC, breaks totaling 60 minutes daily, plus normal breaks. AR 65–66. The VE ruled out all work. AR 66. The record here reflects the unpredictable nature of Pauole's impairments, to the extent that all work would be precluded if she needed to take breaks to recover from a mental health crisis.

(D. Haw. Aug. 23, 2024) (stating that plaintiff's "history of futility at sustaining ongoing performance should have been addressed by the ALJ in crafting an appropriate RFC"). The RFC was thus not based on substantial evidence.

### B. The ALJ Mischaracterized Pauole's Daily Activities

Here, the ALJ found that Pauole "maintained a largely independent lifestyle and ability to care for herself including socializing at the beach with family and go[ing] to stores at times, and she was able to engage in artwork and writing at times," which, to the ALJ, "suggest[ed] fewer limitations than alleged." AR 27. But the ALJ failed to show how Pauole's minimal daily activities "involv[e] the performance of physical functions that are transferable to a work setting" or that she spent a "substantial part" of her day engaging in such pursuits. *Orn*, 495 F.3d at 639. And the Social Security Act does not require claimants to be "utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989), *superseded on other grounds by* 20 C.F.R. § 404.1502(a)); *see also Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 404.1502(a) (remarking that "a claimant need not vegetate in a dark room in order to be eligible for benefits") (internal quotations and citation omitted).

Moreover, Pauole's activities do not contradict her statements about

her symptoms.  Pauole characterized going to Costco and WalMart as only "baby steps" in her ability to leave home.  AR 933, 935.  For over five years, Pauole has felt safe expressing her condition to Dr. Nguyen but only because she can do so from the safety of her bed.  AR 61.  If she goes out in public, it must be with someone she trusts and who understands her anxiety and panic attacks and can protect her "from passerbys."  AR 236.  Artistic pursuits have helped Pauole's OCD symptoms, but she reports engaging in painting and art only once a month, drawing straight lines triggers her anxiety and "messes with [her] OCD symptoms."  AR 236.  These are not grounds for an adverse credibility determination.  Given the record as a whole, substantial evidence does not support the ALJ's rejection of Pauole's symptom testimony.

## V. **CONCLUSION**

For the foregoing reasons, the court REVERSES the ALJ's Decision and REMANDS this action to the ALJ for further proceedings consistent with this Order.  The Clerk of Court shall close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 27, 2025.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge